

Gregory K. McGillivary
gkm@mselaborlaw.com

January 19, 2023

**VIA EMAIL**
Hon. Sarah Netburn
United States Magistrate Judge
Thurgood Marshall
United States Courthouse
40 Foley Square
New York, NY 10007

Re:   *Casis, et al., v. City of New York,* Case No. 1:22-cv-01926-GHW-SN

Dear Judge Netburn:

Plaintiffs respectfully submit this letter on behalf of all Parties regarding the proposed Settlement Agreement ("Agreement" or "Settlement") between Plaintiffs and Defendant, the City of New York ("Defendant" or "City"), in the above-referenced case brought under the Fair Labor Standards Act ("FLSA"). For the reasons set forth below, the Settlement is a fair and reasonable resolution of a *bona fide* dispute and should be approved. The signed Settlement Agreement (Exhibit 1) and a Proposed Order (Exhibit 2) are attached, along with supporting declarations from Plaintiffs' Counsel, Gregory K. McGillivary (Exhibit 3) and Hope Pordy (Exhibit 4). Pursuant to Paragraph 8.1 of the Agreement, should the Court deem a settlement approval conference necessary, the Parties request that a telephonic conference be set at a time convenient to the Court.[1]

Plaintiffs are 173 individuals employed or formerly employed by the City of New York's Department of Parks and Recreation ("DPR") as Urban Park Rangers ("UPRs"), Associate Urban Park Rangers ("AUPRs"), and Associate Park Service Workers ("APSWs"). They have been fully informed of the terms of the Settlement and have been provided with an opportunity to review the Settlement Agreement. ***To date, there have been no objections to the Settlement.*** The Parties now submit the Settlement Agreement for the Court's consideration pursuant to *Cheeks v. Freeport Pancake House, Inc.,* 796 F.3d 199, 206 (2d Cir. 2015), and *Fisher v. SD Prot. Inc.*, 948 F.3d 593, 599-600 (2d Cir. 2020).

I.   **Claims Asserted and Procedural History**

This case was filed in federal court on March 7, 2022, and Plaintiffs filed an Amended Complaint on March 9, 2022. Dkt. 1, 5. Specifically, the case involves the following claims:

---

[1] Should the Court schedule a conference, Plaintiffs' Counsel will notify Plaintiffs of the date and time.

(202) 833-8855 *Main* | (202) 452-1090 *Fax* | info@mselaborlaw.com *Email* | www.mselaborlaw.com
1101 Vermont Avenue NW, Suite 1000 | Washington, D.C. 20005

January 19, 2023
Page 2

1) Defendant failed to compensate Plaintiffs for pre-shift and post-shift work captured in the Defendant's timekeeping system, CityTime ("Uncompensated Pre- and Post-Shift Overtime Claim");
2) Defendant failed to compensate Plaintiffs for overtime work performed during Plaintiffs' unpaid meal periods ("Meal Period Claim");
3) Defendant failed to properly calculate the regular rate of pay in violation of the FLSA by failing to include night shift and vehicle differentials in the calculation of the rate at which overtime was paid ("Regular Rate Claim");
4) Defendant failed to pay overtime at the rate of one and one-half times the regular rate of pay in violation of the FLSA by compensating Plaintiffs for hours in excess of 40 in a workweek with compensatory time or cash at a straight time rate ("Straight Time Claim"); and
5) Defendant failed to pay overtime in a timely fashion ("Late Payment of Overtime Claim").

Plaintiffs also allege that Defendant's conduct lacked good faith and reasonableness, thus entitling Plaintiffs to liquidated damages in an amount equal to their backpay, and that Defendant willfully violated the law, thereby extending the statute of limitations from two to three years under 29 U.S.C. § 255(a).

On May 4, 2022, Defendant requested a pre-motion conference notifying the Court and Plaintiffs of its intent to file a Motion to Dismiss. Dkt. 14. On May 13, 2022, the Court held an initial scheduling conference, and shortly thereafter, issued an Initial Civil Case Management Plan. Dkts. 18, 26. Following the conference, Plaintiffs filed a Second Amended Complaint. Dkt. 29. Defendant filed a Motion to Dismiss the Second Amended Complaint on June 21, 2022. Dkt. 30. After the Motion was fully briefed (Dkts. 36, 40), the Parties agreed to stay this matter to engage in early settlement discussions. Dkts. 43, 44. As part of the agreement to engage in good-faith settlement discussions, Defendant provided detailed payroll and timekeeping data for the Plaintiffs in this matter for the three-year period prior to the date the complaint was filed. Plaintiffs' expert prepared damages calculations. On August 24, 2022, Plaintiffs submitted a settlement offer to Defendant and also provided the computer programming their expert used for the underlying settlement calculations contemporaneous with their offer.

An initial settlement conference was scheduled for October 14, 2022. Dkt. 45. Defendant requested additional time to obtain settlement authority, and the settlement conference was rescheduled for December 1, 2022. Dkt. 47. The Parties participated in the in-person settlement conference on December 1, 2022, and several follow up telephonic sessions before Your Honor. The Parties reached an agreement in principle on January 4, 2023. Dkt. 49.

II.  **Terms of the Proposed Settlement Agreement**

The Agreement provides that Defendant will pay $1,075,000.00 ("Settlement Amount") to resolve the lawsuit. The Settlement Amount will be paid as follows: (1) $444,415.00 in backpay ("Backpay Amount") by checks made payable to each Plaintiff (via direct deposit for current employees or by check delivered to Plaintiffs' Counsel for separated employees) in the amount of each Plaintiff's share as determined by Plaintiffs' Counsel; and (2) one check in the amount of

January 19, 2023
Page 3

$630,585.00 constituting liquidated damages, attorneys' fees, litigation expenses and Service Awards payable to Plaintiffs' Counsel for distribution to Plaintiffs ("Lump Sum Amount").

Plaintiffs and their Counsel have an agreement regarding the distribution[2] of the Lump Sum Amount which is reflected in the Agreement. The Lump Sum Amount will be distributed as follows: (1) $257,420.65 in net liquidated damages; (2) $3,750.00 in Service Awards ("Service Award Amount") to the three named Plaintiffs who also served as Settlement Team Members, each receiving $1,250.00; (3) $16,621.53 in out-of-pocket expenses to Plaintiffs' Counsel; and (5) a 33 and 1/3% contingency fee to Plaintiffs' Counsel in the amount of $352,792.82 calculated after expenses are deducted. Each Plaintiff individually agreed, in writing, to a one-third (33 and 1/3%) contingency fee when they retained the law firms.

The Backpay Amount and Net Liquidated Damages portion of the Settlement Amount were calculated by Plaintiffs' Counsel and will be divided among the Plaintiffs as follows: For each week that a Plaintiff worked as a UPR, AUPR, and/or APSW ("covered title") during the recovery period, the Plaintiff received one point.[3]

---

[2] Defendant takes no position regarding the distribution of the Lump Sum Amount as the distribution amounts were determined solely by Plaintiffs' Counsel pursuant to their agreement with Plaintiffs.

[3] The methodology of using weeks of employment during the relevant statute of limitations period to determine the Plaintiffs' amounts is the methodology used in other FLSA cases involving complicated off-the-clock claims and a variety of different claims wherein the risks and valuations of each claim and the amounts of work time the Plaintiffs may win are difficult to separately quantify for each Plaintiff and for each claim. *E.g., Feiner v. City of New York*, 1:16-cv-08675-PGG, Dkt. 86 (January 16, 2023); *Williams v. City of New York*, Case No. 16-cv- 08671, Dkt. 101 Nov. 7, 2022); *De La Cruz v. City of New York,* Case No. 14-CV-9220-PGG, Dkt. 227 (July 1, 2022); *Foster,* Case 14-cv-04142-PGG-RWL, Dkt. 242 (Dec. 28, 2021)*, Matias v. City of New York*, Case No. 21-cv-1736-GHW, Dkt. 39 (October 29, 2021) (approving settlement agreement for School Safety Agent Level 3 title at NYPD using same distribution methodology); *Campbell v. City of New York,* Case No. 16-cv-8719 (AJN) (SDA), Dkt. 186, (S.D.N.Y. Sept. 17, 2021) (approving settlement agreement for DHS security officers using same distribution methodology); *Murray et al., v. City of New York*, Case No. 1:16-cv-08072 (PKC), Dkt. 228 (S.D.N.Y. Apr. 23, 2021) (approving settlement agreement for various administrative titles at DHS using same distribution methodology); *Lawtone-Bowles et al., v. City of New York,* Case No. 1:16-cv-04240 (AJN) (OTW), Dkt. 157 (S.D.N.Y. Apr. 8, 2021) (approving settlement agreement for DHS motor vehicle operators using same distribution methodology); *Bookman et al., v. City of New York*, Case No. 1:18-cv-04338 (AJN) (OTW), Dkt. 102 (S.D.N.Y. Apr. 8, 2021) (same); *Worley et al., v. City of New York*, Case No. 1:17-cv-04337 (LGS), Dkt. 230 (S.D.N.Y. Jun. 8, 2020) (approving settlement agreement for NYPD school safety agents using same distribution methodology); *Perry v. City of New York*, Case No. 1:13-cv-01015 (VSB) (S.D.N.Y. Feb. 13, 2020) (approving settlement agreement for FDNY Fire Inspectors using same distribution methodology); *Jones v. New York City Housing Authority*, No. 1:17-cv-3683 (JGK) (S.D.N.Y. Dec. 17, 2018) (approving FLSA settlement agreement for NYCHA housing assistants using same distribution method); *Brown v. New York City Housing Authority*, Case No. 1:16-cv-9263(RA) (S.D.N.Y. Sep. 14, 2018)

January 19, 2023
Page 4

The recovery period for each Plaintiff is three years prior to the date a Plaintiff's consent-to-sue form was filed in Court up to January 6, 2023, or their last day of employment, whichever is earlier. The points were then divided into $701,835.65 ("Net Settlement Fund") to determine the dollar value of a point. The Net Settlement Fund is the Backpay Amount and Liquidated Damages after attorneys' fees, litigation expenses, and the Service Award Amount are deducted. Exhibit A to the Settlement lists Plaintiffs' distribution amounts after attorneys' fees and expenses are deducted.[4]

As reflected in Paragraph 2.4 of the Agreement, Plaintiffs have entered into individual agreements with Plaintiffs' Counsel. These agreements provide for a contingency attorney fee amount equal to one-third (33 and 1/3%) of the Settlement Amount calculated after litigation expenses are deducted from the Settlement Amount. Plaintiffs and their counsel are solely responsible for determining the contingency attorney fee applicable to this Agreement. Under the Agreement, Plaintiffs' Counsel shall deduct their contingency attorney fee in the amount of $352,792.82 from the Lump Sum Amount in accordance with Plaintiffs' individual agreements with Plaintiffs' Counsel.

In consideration and exchange for this Settlement, the Plaintiffs agree to release the Defendant for all wage and hour claims through January 6, 2023.

Each Plaintiff has been informed, in writing, of the Settlement Amount, the amount allocated to fees, expenses, and Service Award Amount, the methodology for assigning points, the value of a point, and the number of points calculated for them using the Defendant's payroll data. Each Plaintiff has been given an opportunity to dispute the number of points assigned and to review the point assignments and settlement awards of all other Plaintiffs. To date, there have been no unresolved disputes or objections and the reaction of the collective has been nothing but positive.

### III.   Applicable Factors for Approving FLSA Settlements

A settlement in an FLSA collective action is not effective unless it is approved by either a district court or the United States Department of Labor. *Fisher v. SD Prot. Inc.*, 948 F.3d 593, 599-600 (2d Cir. 2020); *Cheeks v. Freeport Pancake House, Inc.,* 796 F.3d 199, 206 (2d Cir. 2015). "As a result, district courts in this Circuit routinely review FLSA settlements for fairness before

---

(approving FLSA settlement agreement for 856 NYCHA maintenance workers and heating plant technicians using same distribution method); *Johnston v. New York City Housing Authority,* Case No. 1:16-cv- 9924 (S.D.N.Y. Jan. 19, 2018) (approving settlement agreement using same distribution methodology at issue here for NYCHA Exterminators); *Small v. City of New York,* Case No. 1:14-cv-3469 (S.D.N.Y. May 15, 2015) (approving settlement of FLSA claims by NYPD police sergeants using same distribution methodology used here); *Mullins v. City of New York*, Case No. 1:06 cv 20238 (SAS) (same).

[4] Plaintiffs have until January 24, 2023, to review their settlement allocation and to lodge any disputes. Should any valid dispute be submitted to Plaintiffs' Counsel requiring an adjustment to the points, at the Court's request, Plaintiffs will file a revised Exhibit A by January 27, 2023.

approving any stipulated dismissal." *Id.* "Generally, there is a strong presumption in favor of finding a settlement fair, because the Court is generally not in as good a position as the parties to determine the reasonableness of an FLSA settlement." *Lliguichuzhca v. Cinema 60, LLC*, 948 F. Supp. 2d 362, 365 (S.D.N.Y. 2013) (internal quotation marks omitted).

"In determining whether to approve proposed FLSA collective action settlements, courts are mindful of the fact that 'FLSA collective actions do not implicate the same due process concerns as Rule 23 actions.'" *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 476 (S.D.N.Y. 2013); *Willix v. Healthfirst, Inc.*, No. 07 Civ. 1143, 2011 WL 754862, at *5 (E.D.N.Y. 2011). Unlike Rule 23 class actions where failure to affirmatively opt-out results in a class member being bound by an approved class settlement, in an FLSA action like this one, an eligible individual who decides *not* to join is not a party to the case, and as such, is not bound in any way by the settlement agreement, or the final judgment in a case. As such, "[c]ourts approve FLSA settlements when they are reached as a result of contested litigation to resolve bona fide disputes.'" *Id.* (quoting *Beckman*, 293 F.R.D. at 476). "Typically, courts regard the adversarial nature of a litigated FLSA case to be an adequate indicator of the fairness of the settlement." *Beckman*, 293 F.R.D. at 476.

Courts evaluating whether FLSA settlements are reasonable consider the following factors:

(1) the plaintiffs' range of possible recovery;
(2) the extent to which the settlement will enable the parties to avoid anticipated burdens and expenses in establishing their respective claims and defenses;
(3) the seriousness of the litigation risks faced by the parties;
(4) whether the settlement is the product of arm's-length bargaining between experienced counsel; and
(5) the possibility of fraud or collusion.

*Wolinsky*, 900 F. Supp. 2d at 336; *Fisher*, 948 F.3d at 599-600 ("District courts typically evaluate the fairness of a settlement agreement by considering the factors outlined in *Wolinsky*...."). Importantly, under the Second Circuit's *Fisher* decision, "[w]hen presented with a settlement for approval, a district court's options are to (1) accept the proposed settlement; (2) reject the proposed settlement and delay proceedings to see if a different settlement can be achieved; or (3) proceed with litigation." *Fisher,* 948 F.3d at 606.

### A. Application of the *Wolinsky* Factors to the Settlement

As discussed below, the proposed Settlement is fair and reasonable.

#### 1. Plaintiffs' Possible Range of Recovery

The Backpay Amount and Liquidated Damages agreed to by the Defendant to resolve this case, before deducting attorneys' fees, expenses, and the Service Award Amount, is $905,840.00 ("Gross Damages Amount"). McGillivary Decl., ¶ 15. The Defendant also agreed to pay hourly attorneys' fees in the amount of $152,538.47 and expenses in the amount of $16,621.53. *Id.*. These amounts were added to the $905,840.00 to arrive at the total Settlement Amount of $1,075,000.00.

January 19, 2023
Page 6

The Gross Damages Amount is based on damages calculations prepared by Plaintiffs' expert damages witness, Dr. Louis Lanier, which were reviewed by Defendant's expert witness, Dr. Christopher Erath, as part of the Parties' arm's-length negotiations. Plaintiffs believe that the Gross Damages Amount is equal to **98%** of Plaintiffs' total claimed damages using a full three-year recovery period and a full award of liquidated damages if Plaintiffs were successful in demonstrating to a jury that: (1) Plaintiffs worked through their daily 30-minute unpaid meal periods for 37.5 minutes per week, or worked through approximately one and one-quarter meal periods per week; (2) Plaintiffs worked up to 30 minutes per day before and/or after their paid shifts; (3) Defendant, and not Plaintiffs, were responsible for the late payment of overtime thus entitling Plaintiffs to a full award of liquidated damages for the delayed overtime payments; (4) Defendant failed to properly calculate the overtime pay rate by excluding night shift and vehicle differentials; and (5) Defendant committed a willful violation, entitling Plaintiffs to a three-year statute of limitations.

The three-year statute of limitations on all claims is notable, because to achieve this outcome in this matter, Plaintiffs would have been required to prove that Defendant willfully violated the law; otherwise, a two-year statute of limitations would apply. 29 U.S.C. § 255 (a); *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988). Moreover, this issue was the subject of a pending Motion to Dismiss at the time of settlement. *See* Dkt. 30.

The chart below breaks down the valuation of the Gross Damages Amount on a claim-by-claim basis:

| Claim | Back Pay | Liquidated Damages |
|---|---|---|
| Overtime Pay Rate Claim | $11,745 | $11,745 (100%) |
| Straight Time Claim | $3,216 | $3,216 (100%) |
| Late Payment of Overtime Claim | -- | $30,247 (95%) |
| Pre- and Post-Shift Overtime Claim | $190,713 | $181,177 (95%) |
| Meal Period Claim | $238,741 | $235,039 (98%) |

A discussion of the Gross Damages Amount and the associated litigation risks with respect to each claim is set forth below.

***Full Relief on the Overtime Pay Rate and Straight Time Claims.*** On both of these claims, the amounts listed above account for three years of full backpay damages, as well as a full award of liquidated damages equal to the backpay. The calculation of damages for these, and all other claims, was based on Defendant's payroll and timekeeping data for all Plaintiffs.

***Late Payment of Overtime Claim.*** On Plaintiffs' Late Payment of Overtime Claim, which would have required Plaintiffs to prove through summary judgment or at trial that Defendant, and not Plaintiffs, caused the delay in the payment for approved overtime work (e.g., by failing to timely submit requests for overtime work), the Settlement represents liquidated damages equaling 95% of the amount Plaintiffs would have sought at trial. The damages associated with the Late Payment of Overtime Claim are based on a three-year recovery and constitute liquidated damages to compensate Plaintiffs for the delayed, but eventual, payment for the overtime work.

January 19, 2023
Page 7

*Uncompensated Pre- and Post-Shift Overtime Claim.* The settlement damages associated with the Pre- and Post-Shift Overtime Claim are calculated based on the time recorded in the CityTime timekeeping system up to thirty (30) minutes per day total. For example, if in a workweek a Plaintiff worked 40 hours or more and the Plaintiff's CityTime data reflected an additional 30 minutes of uncompensated time on all 5 days in that workweek, 150 minutes (30 minutes multiplied 5 days) of backpay overtime damages were assigned for that workweek for this claim. Additionally, the Settlement Amount represents an amount equal to 95% of the backpay as liquidated damages on the Pre- and Post-Shift Overtime Claim. Of course, Plaintiffs faced risk on this claim in proving through discovery, at the summary judgment stage, and/or at trial that the time captured in CityTime represented time worked *and* that the City knew or should have known about this work.

*Meal Period Claim.* The Settlement represents full backpay on the Meal Period Claim for 37.5 minutes per week, or for the Plaintiffs working through approximately one and one-quarter meal periods per week. Additionally, the Settlement represents an amount equal to 98% of the backpay as liquidated damages on the Meal Period Claim. Plaintiffs faced significant risk on this claim if it were pursued through discovery, at summary judgment, and at trial because Plaintiffs carry the burden of proving the amount of time they worked through their unpaid meal periods each workweek and that the City knew or should have known about this meal period work.

Moreover, for the Pre- and Post-Shift Overtime and Meal Period Claims, even if Plaintiffs were successful in meeting their burden at summary judgment or at trial, it is possible that a jury could have awarded fewer minutes per day of pre- or post-shift overtime and/or meal period work. Significantly, even if a jury ruled in Plaintiffs' favor, a jury may have found that these violations were not willful, resulting in a two-year, rather than three-year recovery period (even if Plaintiffs were successful in defeating Defendant's motion to dismiss on this issue), and it is possible that the Court may not have awarded liquidated damages.

The Settlement Agreement provides for a non-reversionary **$701,835.65** Net Settlement Fund for the 173 Plaintiffs. Plaintiffs believe the Net Settlement Fund, which is the amount to be distributed to the Plaintiffs after fees, expenses and the Service Award Amount are deducted, is equal to **76%** of Plaintiffs' total claimed damages using a full three-year recovery period and a full award of liquidated damages. McGillivary Decl., ¶ 14. The average net settlement amount to be paid to the 173 individual Plaintiffs is **$4,078.53**. *Id.* The median net settlement amount to be paid to the individual Plaintiffs is **$4,502.58.** *Id.*

Considering the risks associated with proceeding with these claims through discovery, motions practice, trial, establishing collective-wide damages, and possible appeals, the Net Settlement Fund amount is certainly reasonable. *See Rojas v. Pizza Pete's LLC*, 2019 U.S. Dist. LEXIS 149717, 2019 WL 4447578, at *5 (net settlement of 36% of total alleged damages after deducting costs and counsels' 1/3 contingency fee is "clearly reasonable given the uncertainties inherent in any litigation"); *Chowdhury v. Brioni America, Inc.*, 2017 WL 5953171, at *2 (S.D.N.Y. 2017) (net settlement of 40% of FLSA plaintiffs' maximum recovery is reasonable); *Redwood v. Cassway Contracting Corp.*, 2017 WL 4764486, at *2 (S.D.N.Y. 2017) (net settlement of 29.1% of FLSA plaintiffs' maximum recovery is reasonable); *Felix v.

*Breakroom Burgers & Tacos*, 15 Civ. 3531, 2016 U.S. Dist. LEXIS 30050, 2016 WL 3791149 at *2 (S.D.N.Y. 2016) (net settlement of 25% of FLSA plaintiff's maximum recovery is reasonable).

In light of this range of recovery as compared to the amounts provided for under the Settlement Agreement, this Settlement represents an excellent result for the Plaintiffs on ***all*** claims.

### 2. Avoiding Anticipated Burdens and Expenses

Litigating FLSA claims through fact discovery, expert discovery, motions for summary judgment, motions to determine if collective treatment at trial is appropriate, and through a multi-day or multi-week trial, would be a resource-intensive process demanding significant additional costly litigation for both Parties.

Specifically, without this Settlement, both Parties would need to spend significant time and resources in extensive discovery, including preparing and responding to written discovery, numerous Plaintiff depositions, numerous Fed. R. Civ. P. 30(b)(6) and fact witness depositions, expert discovery, motions practice, trial preparation, including meeting with and preparing numerous witnesses for trial testimony, preparing trial exhibits, motions *in limine*, pre-trial briefing, drafting jury instructions, voir dire, and a verdict form, preparing opening statements, presenting the case to a jury, preparing summation, presenting the issue of liquidated damages to the Court for a decision, likely post-trial motions practice, and possible appeal. In short, absent settlement, the anticipated burdens and expenses on both Parties were significant.

### 3. Seriousness of Litigation Risks

As noted above, there was risk to both sides on all claims, with the most significant risk in the possible ranges of recovery associated with the amount of uncompensated work performed on the claims that result in the most significant damages to the Plaintiffs: Plaintiffs' Pre- and Post-Shift Claim and Meal Period Claim, as well as the issues of whether the Defendant's violations on all claims were willful and lacked good faith or reasonableness. Given the uncertainty over the potential outcome, both Parties were motivated to settle this dispute early in the litigation.

### 4. Arm's-Length Bargaining

Both Parties engaged in good faith, arm's-length negotiation in reaching this Settlement, including an in-person Settlement Conference with Your Honor, and several follow up telephonic settlement sessions. Plaintiffs' expert witness analyzed detailed payroll information and timekeeping records and shared those calculations and all underlying programing with Defendant. Defendant's expert reviewed and analyzed Plaintiffs' damages calculations, and these calculations were relied upon by the Parties to negotiate the Settlement Amount. Counsel for the Parties negotiated settlement terms over the course of several weeks with Your Honor's guidance and assistance, until a tentative settlement was reached.

Ultimately, the Parties reached an agreement in principle and the settlement terms were then approved by the Plaintiffs' Settlement Team. Thereafter, the Parties negotiated and executed the Settlement Agreement capturing those terms. In addition, all Plaintiffs have been informed of

the Settlement and its terms, and they have been informed of their opportunity, if they so choose, to object to the Settlement terms on an individual basis. In addition, they were informed of the Settlement distribution methodology and the point value. Each Plaintiff has had an opportunity to dispute the number of recovery period weeks assigned to them, to review the amounts and weeks allocated to each and every Plaintiff, including the Service Award Amount, and to read the Settlement Agreement. ***To date, no Plaintiff has lodged any objection to the Settlement.***

### 5. Possibility of Fraud or Collusion

Given the thorough and intensive investigation into this matter by each side to prepare for the Settlement Conference, as well as the Parties' arm's-length negotiations with Your Honor's assistance and guidance and the Parties' good faith participation, including the involvement of Plaintiffs' Settlement Team, in settlement discussions, there was no opportunity for fraud or collusion. The Parties represented their clients zealously and obtained what both Parties consider to be a fair and reasonable settlement of a *bona fide* dispute consistent with standards established in the Second Circuit for FLSA collective action settlements.

### B. The Service Awards to the Settlement Team Plaintiffs are Appropriate[5]

Courts in this Circuit have recognized that, "[i]n FLSA collective actions, just as in Rule 23 class actions, service awards are important to compensate plaintiffs for the time and effort expended in assisting the prosecution of the litigation, the risks incurred by becoming and continuing as a litigant, and any other burdens sustained by the plaintiff." *See, e.g., Sanz v. Johnny Utah 51 LLC*, 2015 WL 1808935 (S.D.N.Y. 2015) (quoting *Diaz v. Scores Holding Co., Inc.*, 2011 U.S. Dist. LEXIS 112187, 2011 WL 6399468 at *3-4 (S.D.N.Y. 2011)).

The Service Awards will be provided to the three Settlement Team members who also served as Named Plaintiffs and assisted in settlement discussions, ultimately approving this Settlement and recommending the Settlement to the collective. McGillivary Decl., ¶ 5. The Service Awards **total $3,750.00** and are approximately 0.3% of the **$1,075,000.00** Settlement Amount. All 173 Plaintiffs have been informed of the Service Award Amount, and none have objected. McGillivary Decl., ¶ 15.

The Settlement Team spent time gathering facts for the initial Complaint, participating in the in-person Settlement Conference, reviewing damages calculations, assessing the various settlement scenarios and facilitating in recommending the Settlement to the other Plaintiffs. Thus, the time and effort exerted by the Settlement Team resulted in a significant benefit to the collective. *Id*. The Settlement Team's willingness to serve the collective achieved favorable results for all 173 Plaintiffs (e.g., median individual settlement amount is $4,502.58 *after* fees, expenses, and the Service Award Amount are deducted). *Id.* Under well-established Second Circuit precedent, the Settlement Team members are entitled to the Service Award Amount sought as part of this

---

[5] Defendant takes no position regarding the Service Award Amount provided to the Settlement Team as this distribution is made pursuant to agreements solely between Plaintiffs and their Counsel.

Settlement.

### C. Attorneys' Fees and Costs[6]

Each of the 173 Plaintiffs signed a written contract in which they agreed to a 33 and 1/3% contingency fee when they retained the law firms handling this case. McGillivary Decl., ¶ 11. Accordingly, under the Settlement, after expenses in the amount of $16,621.53 are reimbursed, Plaintiffs' Counsel will be paid $352,792.82, which represents a one-third (33 and 1/3%) contingency fee of the Settlement net of costs. *See Run Guo Zhang v. Lin Kumo Japanese Rest., Inc.*, 2015 WL 5122530 at *1 (S.D.N.Y. 2015) ("The Court's view is that attorneys' fees, when awarded on a percentage basis, are to be awarded based on the settlement net of costs.").

#### 1. Percentage of the Fund Awards Are Favored and the Amount Sought in this Matter is Similar to Court-Approved Fees in Similar Percentage of the Fund Cases

The Second Circuit favors the use of the contingent percentage of the fund method to compensate attorneys in overtime wage and hour actions. *See, e.g., McDaniel v. County of Schenectady,* 595 F.3d 411, 417 (2d Cir. 2010); *Wal-Mart Stores, In. v. Visa U.S.A., Inc.* 396 F.3d 96 (2d Cir. 2005). The reasoning behind this is straightforward: "[T]he percentage method directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation." *Monserrate v. Tequipment, Inc.*, 2012 WL 5830557 at *3 (E.D.N.Y. 2012). That "powerful incentive" is the very real possibility that plaintiffs' counsel will not recover any fees whatsoever. *Butt v. Megabus Ne. LLC*, 2012 U.S. Dist. LEXIS 137683 at *22 (S.D.N.Y. 2012) ("Class Counsel risked time and effort and advanced costs and expenses, with no ultimate guarantee of compensation. [Therefore, a] percentage-of-recovery fee award of 33.3% is consistent with the Second Circuit's decision").

"Attorneys who fill the private attorney general role must be adequately compensated for their efforts. If not, wage and hour abuses would go without remedy because attorneys would be unwilling to take on the risk. Adequate compensation for attorneys who protect wage and hour rights furthers the remedial purposes of the FLSA and NYLL." *Deleon*, 2015 U.S. Dist. LEXIS 65261, 2015 WL 2255394 at * 5 (FLSA and New York Labor Law claims) (citing *Goldberger v. Integrated Res. Inc.*, 209 F.3d 43, 51 (2d Cir. 2000), for "commending the general 'sentiment in favor of providing lawyers with sufficient incentive to bring common fund cases that serve the public interest.'"). *See Bozak v. FedEx Ground Package Sys.,* 2014 WL 3778211, at *16 (D. Conn. 2014) ("Fee awards in wage and hour cases are meant to "encourage members of the bar to provide legal services to those whose wage claims might otherwise be too small to justify the retention of able, legal counsel."); *Capsolas v. Pasta Resources Inc.,* 2012 WL 4760910, at *8 (S.D.N.Y. 2012)

---

[6] As described in the Settlement Agreement, each Plaintiff has entered into an individual agreement with Plaintiffs' Counsel that contain contingency fee provisions. Defendant is not a party to these agreements. As such, Defendant takes no position regarding Section III.C of this letter other than that Defendant agreed to pay hourly attorneys' fees in the amount of $152,538.47 and expenses in the amount of $16,621.53.

(fee request of one-third is "consistent with the norms of class litigation in this circuit"). As such, evaluating the amount of fees provided for in a settlement agreement using the "percentage-of-recovery" method is consistent with the "trend in this Circuit." *Bannerman v. Air-Sea Packing Grp.*, 2020 WL 408350, at *3 (S.D.N.Y. 2020) (approving attorneys' fees of 33 and 1/3%).

### 2. Private Fee Agreements Should be Honored

Consistent with the Second Circuit's disposition toward contingency fee agreements is its favorable position toward private fee agreements. By enforcing such agreements, the Court provides low income and individual plaintiffs with a powerful tool for enforcing their rights. As the Supreme Court has explained in the civil rights context, "[Nothing] in the legislative history … persuades us that Congress intended § 1988 to limit civil rights plaintiffs' freedom to contract with their attorneys." *Venegas v. Mitchell*, 495 U.S. 82, 87 (1990). This is because "depriving plaintiffs of the option of promising to pay more than the statutory fee if that is necessary to secure counsel of their choice would not further § 1988's general purpose of enabling such plaintiffs in civil rights cases to secure competent counsel." *Id.* at 89-90. Therefore, the fee-shifting provision of § 1988 "controls what the losing defendant must pay, not what the prevailing plaintiff must pay his lawyer." *Id.* at 90. The same holds true in the fee shifting context of the FLSA.[7]

Moreover, courts in this Circuit recognize that where small claims can only be prosecuted through aggregate litigation, such as in the instant FLSA case, attorneys who fill the "private attorney general" role must be compensated for their efforts through enforceable contingent fee agreements. *See, e.g., Viafara v. MCIZ Corp.,* 2014 WL 1777438 at *27-28 (S.D.N.Y. 2014) (approving 33 1/3 % fee consistent with norms of fee shifting litigation in Second Circuit); *Zeltser v. Merrill Lynch & Co.*, 2014 WL 4816134, at *9 (S.D.N.Y 2014) (same); *Sukhnandan v. Royal Health Care of Long Island LLC*, 2014 WL 3778173, at *4 (S.D.N.Y. 2014) (same); *Clem v. KeyBank, N.A.*, 2014 WL 2895918, at *10-11 (S.D.N.Y. 2014) (same). Indeed, many individual litigants, including the Plaintiffs here, likely "cannot afford to retain counsel at fixed hourly rates

---

[7] *See, e.g., Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC*, 497 F.3d 133, n.4 (2d Cir. 2007) (in ADEA case, which incorporates same fee-shifting provision as FLSA, Court concluded that attorney and client should be able to settle distribution of the attorney's fees "according to their own contract terms, which are beyond the province of this Court."); *Samaroo v. Deluxe Delivery Sys.*, 2016 U.S. Dist. LEXIS 34742, 2016 WL 1070346 at *9 n.4 (S.D.N.Y. 2016) (approving attorneys' fees and costs of more than 34% of the settlement noting that "I do not address the fee arrangement between plaintiffs and their counsel because I do not believe I am required to do so under *Cheeks*. As described in *Cheeks*, the purpose of the FLSA is to regulate the relationship between an employee and his employer and to protect the employee from over-reaching by the employer. I do not understand the FLSA to regulate the relationship between the employee as plaintiff and his counsel or to alter the freedom of contract between a client and his attorney."); *Chowdhury v. Brioni Am., Inc.*, 2017 U.S. Dist. LEXIS 196469, 2017 WL 5953171 at *15-16 (S.D.N.Y. Nov. 29, 2017) ("Finally, pursuant to a retainer agreement signed by plaintiffs, plaintiffs' counsel will receive one third of the settlement proceeds, exclusive of counsel's out-of-pocket costs, for contingency fees. Contingency fees of one-third in FLSA cases are routinely approved in this Circuit.").

. . . yet they are willing to pay a portion of any recovery they may receive in return for successful representation." *deMunecas v. Bold Food, LLC*, 2010 U.S. Dist. LEXIS 87644, 2010 WL 3322580 at *21-22 (S.D.N.Y. 2010) (quoting *In re Abrams*, 605 F.3d 238, 245-46 (4th Cir. 2010)).

Here, each Plaintiff entered into a private fee agreement to pay their "private attorneys general" a 33 and 1/3% percent contingency fee.[8] The agreement provides:

> In consideration of the services of McGillivary Steele Elkin LLP and Spivak Lipton LLP ("MSE and SL"), and such other law firms with whom they deem necessary to work on my case, I agree to pay such attorneys 33 and 1/3% (thirty-three and 1/3 percent) of my total gross recovery (inclusive of attorneys' fees recovered from defendants) as attorneys' fees. In the event that MSE and SL recovers attorneys' fees from the defendants in this action, and such fees are in an amount equal to or above the contingent fee, I will not pay a contingent fee and MSE and SL will retain all of the attorneys' fees recovered from the defendant as payment for legal services. If the complaint brought on my behalf results in no recovery, I will have no obligation to pay attorneys' fees.

McGillivary Decl., Ex. B, at 2. Defendant agreed to pay $152,538.47 in statutory fees and expenses in the amount of $16,621.53, which does not exceed 33 and 1/3% of the total gross recovery.

Additionally, there are no "absent" class members in this case. Instead, all 173 Plaintiffs knew about the 33 and 1/3% contingency fee at the start of the case, each Plaintiff signed a contract agreeing to pay it, and each Plaintiff has been informed about the amount they will now pay once the Court approves the settlement. **No Plaintiff has objected to the fees or expenses.** For all of these reasons, this Court should "enforce the parties' intentions in a contingent fee agreement, as with any contract." *Alderman v. Pan Am World Airways*, 169 F.3d 99, 103 (2d Cir. 1999).

### 3. The Attorneys' Fees Sought in This Matter are in Line with or Less than Settlements of Similar Size, Complexity and Subject Matter

As courts in this Circuit have repeatedly recognized, "[w]hen using a 'percentage of the fund' approach, 'courts regularly approve attorney's fees of one-third of the settlement amount in FLSA cases.'" *Xiao v. Grand Sichuan Intn'l St. Marks, Inc.*, 2016 U.S. Dist. LEXIS 99669, 2016 WL 4074444 at *3 (S.D.N.Y. Jul. 29, 2016) (citing *Meza v. 317 Amsterdam Corp.*, 2015 U.S. Dist. LEXIS 166890, 2015 WL 9161791 (S.D.N.Y. Dec. 14, 2015)). *See Bryant v. Potbelly Sandwich Works, LLC*, 2020 U.S. Dist. LEXIS 21900, 2019 WL 1915298, at *15 (S.D.N.Y. Feb. 4, 2020) (in FLSA/Rule 23 hybrid, approving one-third of common settlement fund as "reasonable and well within the accepted range awarded in wage and hour cases in this District and throughout the Second Circuit"); *Cruz v. Sal-Mark Rest. Corp.*, 2019 U.S. Dist. LEXIS 13529, 2019 WL 355334 at *21 (N.D.N.Y. Jan. 28, 2019) (approving one-third fee, noting that a "presumptively reasonable fee takes into account what a reasonable, paying client would pay" and this "supports a one-third (33.33%) recovery in a case like this one where Class Counsel's fee entitlement is

---

[8] A copy of the contingency fee agreement signed by Plaintiff Sally Casis (with Personally Identifiable Information redacted) is attached to the Declaration of Gregory K. McGillivary as Exhibit B. This is the same agreement each of the 173 Plaintiffs signed.

January 19, 2023
Page 13

entirely contingent upon success"); *Chung v. Brooke's Homecare LLC,* 2018 WL 2186413, at *3-4 (S.D.N.Y. 2018) (awarding one-third fee, noting that "Courts routinely award 33.33% of a settlement fund as a reasonable fee in FLSA cases"); *Penafiel v. Babad Mgmt. Co., LLC,* 2018 U.S. Dist. LEXIS 66991, 2018 WL 1918613 at *9 (S.D.N.Y. Apr. 18, 2018) (awarding 33.3% fee, noting "Contingency fees of one-third in FLSA cases are routinely approved in this Circuit").

"[T]he most critical factor in determining the reasonableness of a fee award is the degree of success obtained." *Fisher,* 948 F.3d at 606 (quoting *Farrar v. Hobby*, 506 U.S. 103, 114, 113 S. Ct. 566, 121 L. Ed. 2d 494 (1992)) (internal quotation marks omitted). Indeed, as these cases make clear, the contingent fee percentage being paid by Plaintiffs is **consistent** with the one-third fee routinely approved in this Circuit, and, as explained in Part II.A.1, the degree of success obtained is outstanding given that it achieved significant, if not full relief, on all claims without the need to spend *years* in drawn out, resource intensive litigation. In short, the result for Plaintiffs is outstanding.

### 4. Early Settlement of Wage and Hour Cases is Encouraged

Notably, the thorough investigation by Plaintiffs' Counsel into the claims of the Plaintiffs allowed the parties to enter into early meaningful settlement negotiations. In approving settlement agreements, district courts in the Second Circuit consider a request for approval of a percentage of the fund in light of the importance of encouraging the swift resolution of collective actions and avoiding creating a disincentive to early settlement. *See e,g,., Lesser v. Tiaa Bank*, No. 19-CV-1707 (BCM), 2020 U.S. Dist. LEXIS 194281, at *8 (S.D.N.Y. Oct. 20, 2020) (approving a one-third percentage of the fund to plaintiffs' counsel and noting that considering the relevant factors, "including the 'degree of success obtained' — which the Court finds to be significant in light of the litigation risks summarized above and the costs and uncertainties that have been avoided — and 'recognizing the importance of encouraging the swift resolution of cases like this one and avoiding 'creating a disincentive to early settlement, the Court concludes that counsel's proposed fee award is fair and reasonable.'") (quoting *Pinzon v. Jony Food Corp.*, No. 18-CV-105(RA), 2018 U.S. Dist. LEXIS 87424, at *9 (S.D.N.Y. May 24, 2018)).

Here, as explained above, the degree of success obtained in this matter is excellent, and this early settlement allows Plaintiffs to recover their settlement amounts in a timely manner without facing the risks associated with discovery, motions practice and trial, which was likely to focus on issues related to the Defendant's defenses in this matter. In short, in light of the degree of success obtained, approval of this early Settlement including the requested one-third percentage of the fund for attorneys' fees encourages swift resolution of similar cases and avoids creating a disincentive to early settlement.

### 5. The Fee is Reasonable Based on "Traditional Criteria"

In determining a reasonable award of attorneys' fees, this Court may also consider the "traditional criteria" such as "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement and (6) public policy considerations. *Goldberger,* 208 F. 3d 43, 50 (2d Cir. 2000) (internal quotations omitted). An analysis of these criteria further

supports the fee requested, in addition to Plaintiffs' individual contingency fee agreements with Plaintiffs' Counsel as described above.

### 1. The Litigation was Complex

"The size and difficulty of the issues in a case are significant factors to be considered in making a fee award." *Sukhnandan v. Royal Health Care of Long Island LLC*, 2014 U.S. Dist. LEXIS 105596, 2014 WL 3778173 at *10 (S.D.N.Y. 2014). Here, given the size of the collective, and the sophistication of the employer and its policies, this case did not represent a straightforward FLSA claim where a single employee seeks compensation for an easily defined amount of unpaid work. It involved hundreds of Plaintiffs, working across the five boroughs in different work locations and three different job titles. As a result, this litigation was complex, and Plaintiffs' Counsels' expertise greatly benefitted the 173 plaintiffs.

To start, the case involved a thorough investigation by Plaintiffs' Counsel to determine the extent of the violations. McGillivary Decl., ¶ 9; Pordy Decl., ¶ 13. This investigation involved determining the specific claims at issue, the possible defenses the Defendant's may have raised, and common violations sufficient to demonstrate collective certification. To do this, Plaintiffs' Counsel interviewed numerous Plaintiffs in various job titles to understand the scope of their claims, and possible difficulties in presenting Plaintiffs' theory of liability, and possible defenses that Defendant may raise. Moreover, this case is a collective action, which requires research and investigation into the Defendant's common policies and/or practices which violate the FLSA in order to properly plead the collective allegations. Additionally, Plaintiffs' Counsel was required to research and brief the Plaintiffs' Opposition to Defendant's Motion to Dismiss, which was still pending at the time of the Settlement Conference. Plaintiffs' Counsel engaged an expert to analyze the City's data and prepare weekly settlement calculations for each Plaintiff based on alternate theories of liability and spearheaded settlement discussions on behalf of the Plaintiffs. Finally, Plaintiffs' Counsel prepared for the Settlement Conference in this matter, which included preparing a settlement conference statement and supplemental statements based on issues raised during the conference.

### 2. The Time and Labor Required

Significant time and labor were spent by Plaintiffs' Counsel in litigating this matter through early discovery and reaching the settlement.[9] McGillivary Decl., ¶ 7-29; Pordy Decl., ¶¶ 7-9, 14, 16-19. During the time spent litigating this lawsuit, Plaintiffs' Counsel have not been paid for any of the work that they have performed. This uncompensated work has been substantial and includes: 1) interviewing more than 30 Plaintiffs and investigating claims; 2) researching the claims and possible defenses at issue in this matter; 3) preparing and filing the Complaint, Amended Complaint, Second Amended Complaint, and Opposition to Defendant's Motion to Dismiss; 4) preparing for and participating in theIinitial Case Management Conference; 5) negotiating an

---

[9] Attached as Exhibit A to the Declaration of Gregory K. McGillivary (Exhibit 3 to this letter) are the fee and expense listings for services performed by McGillivary Steele Elkin LLP. Attached as Exhibit A to the Declaration of Hope A. Pordy (Exhibit 4 to this letter) are the fee and expense listings for services performed by Spivak Lipton LLP.

Initial Case Management Report and Discovery Plan; 6) negotiating a mediation agreement and stay; 7) reaching an agreement with Defense Counsel on the data necessary to calculate damages; 8) engaging an expert damages witness to prepare damages calculations by analyzing millions of lines of data; 9) preparing a settlement demand; 10) preparation for the settlement conference including preparing a settlement conference statement and meeting with the Settlement Team; 11) engaging in extensive settlement discussions, including attending the in-person settlement conference and several telephonic sessions with Your Honor; 12) negotiating the written terms of the Settlement Agreement; 13) notifying 173 Plaintiffs of the terms of the Settlement; 14) responding to questions regarding the Settlement; 15) preparing the Settlement approval papers; and 16) preparing for administration of the Settlement. McGillivary Decl., ¶ 9; Pordy Decl., ¶ 13.

### 3. The Fee in Relation to the Settlement Fund is Reasonable

The cases cited in Section III.b confirm the reasonableness of the requested fee, as it is consistent with other FLSA cases in this Circuit. As demonstrated in Section III.C.7 below, the fee represents a lodestar multiplier of 1.2256, which is well within the range approved by courts in this Circuit.

In this case, each of the 173 individual Plaintiffs determined that the fair market rate for Plaintiffs' Counsel was 33 and 1/3% of the funds recovered, and thus awarding attorneys' fees consisting of that amount is warranted.

### 4. The Risk of Litigation

Plaintiffs' Counsel undertook to prosecute this action without any guarantee of payment and litigated on a contingent basis. Plaintiffs' Counsel was required to make a significant investment of time and resources without a guarantee of payment of any kind. The success of such unpaid work time cases on a class wide basis involving 173 employees would have been hard fought at trial by Defendant, and Defendant would have attempted to move for summary judgement and/or to decertify the collective. Accordingly, Plaintiffs' Counsel faced significant obstacles of recovery for the entire class on all claims absent settlement.

### 5. The Quality of Representation

As described fully in the Declarations of Gregory K. McGillivary and Hope Pordy, Plaintiffs' Counsel are nationally-recognized experts in the FLSA and wage and hour law, and their expertise greatly benefited Plaintiffs. For example, Mr. McGillivary has litigated hundreds of FLSA cases and is the author of the government chapter in the treatise "The Fair Labor Standards Act," E. Kearns, and Plaintiffs benefited from this level of expertise. McGillivary Decl., ¶¶ 19. *See also* Pordy Decl., ¶¶ 7-12. Both Mr. McGillivary and Ms. Pordy have significant experience litigating similar FLSA collective actions against the City of New York which also greatly aided the Plaintiffs and resulted in this successful outcome. McGillivary Decl., ¶¶ 10, 18. *See also* Pordy Decl., ¶¶ 7-12, 14.

### 6. Public Policy Weighs in Favor of Approving the Fee

As described above, the risk in this case was high and the work performed by Plaintiffs' Counsel significant. Plaintiffs' case was hardly "run of the mill," in that Plaintiffs presented claims based on common policies and practices which would require proof that collective treatment was warranted. In seeking collective relief, Plaintiffs achieved the FLSA's policy objectives by avoiding the financial and judicial burden of 173 individualized trials, and of reducing costs and increasing efficiency. As such, Plaintiffs' Counsel vindicated the rights of those whose wage claims might otherwise be too small to justify the retention of able, legal counsel through the use of a collective proceeding. This advances the broad remedial public policy purposes of the FLSA.

### 7. A Lodestar Cross-Check Support the Fees Requested

The lodestar multiplier is calculated by dividing the fee award by the lodestar (the reasonable hours billed multiplied by a reasonable hourly rate). *James v. China Grill Mgmt.*, 2019 U.S. Dist. LEXIS 72759, 2019 WL 1915298 at *8 (S.D.N.Y. 2019). "Where the lodestar method is used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court. Instead, the reasonableness of the claimed lodestar can be tested by the court's familiarity with the case." *Bryant v. Potbelly Sandwich Works, LLC*, 2019 WL 1915298, at *19 (S.D.N.Y. 2020). Here, in light of the individual agreements with Plaintiffs' Counsel signed by each of the 173 Plaintiffs providing for a 33 and 1/3% contingent fee, and expressly incorporated into the Settlement Agreement, the Court may find on that basis, alone, that the negotiated Agreement sufficiently establishes the reasonableness of the fee. *See* discussion *supra*, Part III.C.1. Nevertheless, a lodestar cross-check will further demonstrate that the Settlement is fair and reasonable based on approved fee awards within the Second Circuit.

Multiplying the hourly rates here by the hours of work performed results in a lodestar of $287,859.00. McGillivary Decl., Ex. A; Pordy Decl., Ex. A. Thus, Plaintiffs' Counsel's 33 and 1/3 % contingent fee agreement with the Plaintiffs resulted in a multiplier of 1.2256 "Courts in this Circuit regularly award lodestar multipliers from two to six times lodestar with some courts approving fee requests that are up to eight times the lodestar, and in some cases, even higher...." *Bryant v. Potbelly Sandwich Works, LLC*, 2020 WL 563804, at *19 (S.D.N.Y. 2020); *Beckman*, 293 F.R.D. at 481; *Ceka v. PBM/CMSI Inc.*, 2014 WL 6812127, at *1 (S.D.N.Y. 2014) (approving 3.36 multiplier); *Pena v. Le Cirque, Inc.*, No. 14 Civ. 7541, Dkt. Nos. 45 & 46 (approving 4.9 multiplier); *James v. China Grill Mgmt.*, 2019 U.S. Dist. LEXIS 72759, 2019 WL 1915298 at *8-9 (approving 3.53 multiplier).

Where a lodestar cross-check is applied, courts consider "whether a multiplier is warranted based on factors such as (1) the contingent nature of the expected compensation for services rendered; (2) the consequent risk of non-payment viewed as of the time of filing the suit; (3) the quality of representation; and (4) the results achieved." *Henry*, 2014 U.S. Dist. LEXIS 72574, 2014 WL 2199427 at *43-44; *In re Boesky Secs. Litig.*, 888 F. Supp. 551, 562 (S.D.N.Y. 1995); *see also Goldberger*, 209 F.3d at 4.

As set forth above, Plaintiffs' Counsel zealously and skillfully litigated this collective action with no guarantee of success and in response to the Defendant's vigorous defense. Moreover, the Plaintiffs — a group of 173 essential security personnel working in New York City

January 19, 2023
Page 17

parks and other recreational venues— achieved an outstanding degree of success in recouping unpaid overtime wages. Under these circumstances, a 1.2256 multiplier is appropriate.

### b. Approval of Plaintiffs' Counsels' Expenses is Warranted

In this litigation, Plaintiffs' Counsel has incurred $16,621.53 in out-of-pocket expenses. A detailed breakdown of the expenses incurred by McGillivary Steele Elkin LLP is attached to the Declaration of Gregory McGillivary as Exhibit A. A detailed breakdown of the expenses incurred by Spivak Lipton LLP is attached to the Declaration of Hope Pordy as Exhibit A. Counsel are entitled to reimbursement of litigation expenses from the settlement fund. 29 U.S.C § 216(b). Plaintiffs' Counsel's expenses, including experts, copying, electronic research, travel and printing, were reasonable and necessary for effective representation of Plaintiffs. *McGreevy v. Life Alert Emergency Response, Inc.*, 258 F. Supp. 3d 380, 390 (S.D.N.Y. 2017) (awarding expenses for experts, copying, electronic research, travel and printing, and other out-of-pocket expenses).

## II. Conclusion

For all of the above reasons, the Parties believe that this Settlement is a favorable outcome and will appropriately compensate Plaintiffs for the overtime pay issues that are the subject matter of this litigation. Accordingly, the Parties respectfully submit that the Settlement, in its entirety, is fair and reasonable and should be approved by the Court.

Sincerely,

McGILLIVARY STEELE ELKIN LLP

Gregory K. McGillivary

cc:   All Counsel of Record (via ECF)